Croninger Packing Company, Inc., James F. Kelley and Ray D. Marshall, Receivers v. Commissioner.
Croninger Packing Co. v. Commissioner
Docket No. 407 P.T.
United States Tax Court
1943 Tax Ct. Memo LEXIS 29; 2 T.C.M. (CCH) 1126; T.C.M. (RIA) 43509; December 15, 1943
*29 1. Petitioners' taxpayer was a processor of hogs. Processing taxes were imposed upon the taxpayer under the Agricultural Adjustment Act from November 5, 1933 to and including the time when the act was declared unconstitutional by the Supreme Court. During this time the taxpayer paid these taxes over a period extending from November 1933 to February 1935. For some of the months included in this period the taxpayer paid the tax in full and paid a part of the tax for some of the other months but paid no tax for the months from May to October, 1934, inclusive. Held, the "tax period" referred to in section 907 of the Revenue Act of 1936 includes only the months and portions of months with respect to which the taxpayer actually paid the processing tax and excludes the months and portions of months in which no tax was paid. 2. Upon the evidence offered to establish a prima-facie case, held, petitioners have established a rebuttable presumption under section 907(a) of the Revenue Act of 1936 that the burden of the processing taxes paid by the taxpayer was borne in part by the taxpayer and was in part shifted to others. 3. Upon the evidence offered in rebuttal under section 907(e) *30 of the Revenue Act of 1936, held, petitioners have established that a part of the processing taxes presumed to have been shifted to others was in fact borne by the taxpayer. Robert P. Smith, Esq., and Francis F. Reamer, Esq., for the petitioners. Irene F. Scott, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion This proceeding arose from the disallowance by the Commissioner of a claim for refund of $20,871.45 paid by the Croninger Packing Company, Inc. as processing taxes under the provisions of the Agricultural Adjustment Act, as amended, upon the processing of hogs. Pursuant to Title VII of the Revenue Act of 1936 petitioners filed with the Board of Review a petitione for review of the disallowance of the claim. Prior to a hearing on the merits of the petition Congress by section 510 of the Revenue Act of 1942 transferred to and vested in the Board of Tax Appeals (now The Tax Court of the United States) the jurisdiction previously vested in the Board of Review. The issue in the proceeding is whether the Croninger Packing Company, Inc. bore the burden, in whole or in part, of the processing taxes paid by it, and if so, to what extent it bore such burden. *31 Findings of Fact Petitioners are receivers of the Croninger Packing Company, Inc., appointed by the Court of Common Pleas of Northumberland County, Pennsylvania, in Equity No. 724 with principal place of business at Shamokin. Pennsylvania. The Croninger Packing Company, Inc., sometimes hereinafter referred to as the taxpayer, was a corporation. For the period under consideration it operated primarily a pork processing plant, and purchased its live hogs from the stockyards of Chicago, Illinois, Omaha, Nebraska, and Lancaster, Pennsylvania, or in its immediate neighborhood, which hogs were processed by it for public sale and consumption. During the period here in question hogs were slaughtered, bled, scalded to loosen the hair, dehaired first by machine process and finished by hand knives, after which they were conveyed to a cutter, a separator and other machinery where they were reduced to a dressed state, in two sides, at the rate of 45 or 50 an hour by Croninger Packing Company and were then placed in a cooler overnight to remove body heat. Upon removal from the cooler, they passed through a series of labor operations severing them into various marketable parts, such as hams, *32 bacon, shoulders, etc. Shoulders and loins were all sold fresh, except when there was a seasonal slump for shoulders, when they were used in the kitchen for the manufacture of sausage, bologna, etc. Hams and bacon were cured by two methods, wet and dry processes. Curing required from three weeks to two months, depending on the material and attending conditions. After curing, the meat was smoked. The hams remained in the smoking process between 20 and 24 hours. In the case of bacon, curing and smoking ready for market required between three and one-half and four and one-half weeks, and in the case of hams, approximately eight weeks. The plant is located on the Reading Railroad, the main building triangular shape, being 165 feet long by 60 feet by 70 feet. One-half of the building from the basement to the roof is entirely cold storage, so that one-half may be used for refrigeration while the other half is used for processing. Hogs are slaughtered on the top or fourth floor of the building where also the rendering of lard begins. Hogs are cut up, fat trimmed off and returned to the fourth floor where begins the processing of lard, which requires cooking, the draining off of fat and *33 fibrous matter and chilling for packing. The resulting fibrous matter and cracklings are of little value and are used for chicken feed. The taxpayer also operates an ice plant, a 60 ton unit with 704 freezing cans, a salt storage room and customary equipment for harvesting ice. This is a simple, one-man operation. It is sold solely at its platform to wholesalers who carry it away. As more of a courtesy to customers than for profit, the taxpayer also handles beef, its beef business occupying not more than two or three per cent of its plant. The taxpayer has always followed the practice of making cutting or yield tests for the determination of its costs and the ultimate sales prices of its product. It withdraws a certain percentage of carcasses from each group of hogs killed and the dressed weight of each carcass is determined. After those carcasses have remained in the chilling room the required time, those same carcasses are cut into the various salable parts and each separate unit weighed. The total of those weights very closely approximates the weight of the hogs withdrawn for testing that came out of the chilling room. There is a slight shrinkage during the chilling process; *34 also in the cutting. From this test it arrives at certain percentages of weight of the hog which may be allocated to the various cuts and from which its sales price schedules are determined. Based upon its test for the period from November 1933 to February 1935, inclusive, using the preslaughter weight, upon which the processing tax was paid, the taxpayer determined a yield of 81.294 percent per cwt. The difference between the yield of 81.294 percent and 100 percent represents the inedible waste derived from each 100 pounds. The yield of the salable parts of the commodities processed for the "base period" [1] was obtained from cutting tests made during the base period, so that the factor for obtaining gross sales value for the base period and the "tax period" [2] are on a comparable basis. *35 The taxpayer's records did not disclose the preslaughter weight of hogs processed for the base period, and in order to determine the preslaughter weight for the base period, the shipping weights for the base period were reduced by the same percentage as the preslaughter weight for the tax period bore to the shipping weight for the tax period, thus placing this factor for the two periods on a comparable basis. The taxpayer prepared and filed with the Collector of Internal Revenue at Scranton, Pennsylvania, monthly processing tax returns for each of the months from and including November 1933, to and including December 1935. The tax assessed on the aforesaid returns was paid by the taxpayer to the extent and in the amount as shown by the following schedule: Payments
Month Ending
Assessment
Date
Amount
November 30th, 1933
$ 962.95
12/30/33
$ 962.95
December 31st, 1933
1,640.57 1/31/34
1,640.57
January 31st, 1934
2,411.36 3/30/34
500.00 4/10/34
1,911.36
February 28th, 1934
2,792.78 4/30/34
792.78 5/17/34
1,008.00 5/29/34
500.00 6/18/34
200.00 7/26/34
292.00 9/28 - Interest
8.00
March 31st, 1934
2,761.87 8/14/34
1,797.10
Interest
41.42 9/12/34
600.00 9/28/34
364.77
Penalty
138.10
Interest
111.79
April 30, 1934
4,129.87
10/ 6/34
700.00
10/11/34
700.00
10/19/34
800.00
11/ 9/34
800.00
11/23/34
1,000.00
May 31, 1934
4,290.53
June 30, 1934
3,751.34
July 31, 1934
3,935.70
August 31, 1934
4,088.47
Sept. 30, 1934
3,233.25
October 31, 1934
4,438.91
November 30, 1934
4,035.38
12/13/34
2,035.38
12/29/34
2,000.00
December 31, 1934
4,731.53 1/30/35
731.53
January 31, 1935
4,784.58 2/23/35
600.00
February 28, 1935
4,135.70 3/27/35
635.70
$56,124.79
$20,871.45
*36 There was assessed and not paid for the months of March 1935 to December 1935, inclusive, the sum of $46,586.27. Based on the schedule of payments set out in the preceding paragraph, the following schedule disclosed the month or portion of month to which the tax paid is applicable: Percentage
Month
Assessed
Paid
Paid
November 1933
$ 962.95
$ 962.95
100%
December 1933
1,640.57
1,640.57
100%
January 1934
2,411.36
2,411.36
100%
February 1934
2,792.78
2,792.78
100%
March 1934
2,761.87
2,761.87
100%
April 1934
4,129.87
4,000.00
96.855%
November 1934
4,035.38
4,035.38
100%
December 1934
4,731.53
731.53
15.461%
January 1935
4,784.58
600.00
12.540%
February 1935
4,135.70
635.70
15.371%
Interest
161.21
Penalty
138.10
Total paid
$20,871.45
The gross sales value of the commodities processed during the tax period and base period was obtained by computing the weekly average prices of sale from the actual invoices. The sales price thus obtained was applied to the computed yield of the various salable parts of the hogs, and by this method of computation the gross sales value of the commodities processed for the tax period, as well *37 as the base period, was determined. The gross sales value of pork processed during the tax period as well as the base period is computed on the basis of the prices of fresh pork at preslaughtered weight, except for three items, namely, rib bellies, boneless bellies and strawberry bellies. These three items were computed on the basis of prices of smoked pork at preslaughtered weight. The sales price of cured hams is slightly higher than the sales price of fresh hams but due to curing there is a shrinkage in weight of about 9 1/2 percent of the preslaughtered weight. Notwithstanding this last fact both the respondent and the petitioners have submitted their proposed computations upon the above-mentioned basis and that basis is accepted for the purposes of this proceeding. The cost of the commodities processed on which the processing tax was imposed was recorded on the books and records of the taxpayer and the same information is obtainable from the books and records for the base period. The "tax period" in this proceeding, as that term is used in section 907(c), Revenue Act of 1936, consists of the entire time from November 5, 1933 to March 31, 1934, inclusive, 96.855 percent of April *38 1934, 100 percent of November 1934, 15.461 percent of December 1934, 12.54 percent of January 1935, and 15.371 percent of February 1935. The "period before and after the tax" as that term is used in section 907 (c), Revenue Act of 1936, sometimes referred to herein as the base period consists of the entire period from November 4, 1931 to November 4, 1933, inclusive, and the six months, February to July 1936, inclusive. The "gross sales value of articles," the "cost of commodity" and the "units of commodity processed" for the "tax period" as those respective terms are used in section 907 (b) of the Revenue Act of 1936 are as follows: Total gross sales value for tax
period
$128,105.67
Total cost of commodity for
same period
$ 69,822.15
Total units (cwt.) processed
during such period
13,512.77
The "gross sales value of articles," the "cost of commodity" and the "units of commodity processed" for the "period before and after the tax" as those respective terms are used in section 907 (b) of the Revenue Act of 1936 are as follows: Total gross sales value
$591,903.39
Total cost of commodity
389,455.62
Total units (cwt.) processed
63,840.69
The "average margin *39 for the tax period" as that term is used in section 907 (b) of the Revenue Act of 1936, is determined as follows: 1. Name of commodity
Hogs
2. Unit of commodity
Hundred-weight
3. Total gross sales value
$128,105.67
4. Total cost of commodity
processed
69,822.15
5. Total processing tax paid
20,871.45
6. Item 4 plus Item 5
90,693.60
7. Margin (Item 3 minus
Item 6)
37,412.07
8. Total units of commodity
processed
13,512.77 cwt.
9. Average margin (Item 7
divided by Item 8)
2.7686
The "average margin for the period before and after the tax" as that term is used in section 907 (b) of the Revenue Act of 1936, is determined as follows: 1. Name of commodity
Hogs
2. Unit of commodity
Hundred-weight
3. Total gross sales value
$591,903.39
4. Total cost of commodity
processed
389,455.62
5. Margin (Item 3 minus
Item 4)
202,447.77
6. Total units of commodity
processed
63,840.69 cwt.
7. Average margin (Item 5
divided by Item 6)
3,1711
Petitioners in accordance with section 907 (a) of the Revenue Act of 1936 have established a rebuttable presumption that the burden of the processing taxes in question in the amount of $20,871.45 was borne by the taxpayer to the extent *40 of $5,438.89, computed as follows: 1. Average margin per unit for
base period
$3.1711
2. Average margin per unit for
tax period
2.7686
3. Excess average margin per
unit for base period over
tax period
$ .4025
4. Total units processed for
tax period
13,512.77 cwt.
5. Burden of tax under prima-
facie showing borne by
the taxpayer (Item 3 mul-
tiplied by Item 4)
5,438.89
[3] In October 1933, the cost of live hogs was somewhere around $5.00 per cwt. In November 1933, the cost was slightly over $4.00 per cwt. and in December 1933, the cost had dropped to around $3.30 to $3.50 per cwt. The cause for the decline in the sale prices of some of the cuts, as shown in the preceding paragraph, was due to this drop in the market for livestock. In determining the sale price of each cut, in addition to taking into consideration the breakdown of the various cuts and the yield tests made, the actual sales price was largely controlled by the prices of competitors. *41 The NRA law, which was enacted in 1933, had the effect of increasing manufacturing costs. In 1933 and 1934 the processing plant, machinery and buildings were in very bad condition and needed considerable repairs, such as, reinsulation work, a new roof, repairs to the floors and machinery. The estimated cost of necessary repairs to put buildings and machinery in operating condition in 1933 was $35,000 to $40,000 but such repairs could not be made by reason of the lack of funds due to increased NRA costs, and the imposition of the processing tax. The bad condition of the plant and equipment resulted in increasing the manufacturing costs during the year 1934 and subsequent years so that the plant could not be economically operated and ultimately caused the company to go into receivership. The plant and equipment having an undepreciated cost of $136,204.56 as of 1933 was ultimately sold by the receiver in November 1942 for $8,000 for the improvements and $17,000 for the ground value. The economic useful life of the buildings and machinery was estimated at from five to six years from 1933. By reason of lack of funds available to make necessary repairs, the depreciation sustained on *42 the plant and equipment from and after 1933 was in excess of the amount claimed as a deduction on the income tax returns. The income tax returns of the taxpayer for the years 1936 to 1940 showed a loss from operations before deducting depreciation. The ice plant was a separate and distinct operation. Sales and cost of operation of the ice plant transactions were kept separate on the books and records. The net profit from the operation of the ice plant for the year 1934 was $9,049.07. The operations from processing pork for the entire year 1934, without taking into consideration the amount of processing tax actually paid, resulted in a loss. There was no change in the formula for mixing sausage, or curing pork processed between the tax period and the base period. The percent of sales of beef during the tax period and the base period was approximately the same. No sales were made to customers on a basis other than arm's length transactions. The taxpayer has no arrangement with any of its vendees to refund any part of the tax that it may secure as a refund. There were no changes whatsoever in the size of the packages, or the size of the cuts, nor were any discounts allowed that *43 might have permitted the tax to be shifted. The taxpayer had no arrangements whatsoever with any vendee or customer that might have included the tax. It in no way changed its methods of curing, packing or processing products during the tax period from the method used in the base period. The processing operations continued during the tax period in the same manner as had been previously carried on before the imposition of the tax. The processing tax was not billed as a separate item to any customer or vendee nor did the taxpayer indicate by any writing that the sales price included the amount of the tax. In order to pay the processing tax that was imposed and keep the taxpayer in operation, officials of the taxpayer several times during the year 1934 attempted unsuccessfully to secure loans from the Reconstruction Finance Corporation, from the brokerage firm of Leavens & Leader, and every bank in the local community. The loans were refused and not considered a good risk by the several banking institutions by reason of the priority of the Government's claim for the outstanding and unpaid processing taxes. After the imposition of the processing tax, the board of directors of the taxpayer *44 considered the matter of this tax many times and it was their opinion, and they were so advised by counsel, that the Act imposing the tax was unconstitutional. The board of directors was of the opinion that the tax would not last very long, and that due to economic conditions it would be impossible to add the tax to the selling price, and that the company itself would have to make some provision to absorb the tax temporarily until the Act was declared unconstitutional or withdrawn. The taxpayer's pork processing "costs of production" as that term is used in section 907 (e)(1)(B) for the base period amounted to $169,022.19 or $2.6476 per cwt. of the 63,840.69 units processed during that period. These costs were made up of the following items: Percentage
Amount
Allocated
Allocated
Item
Beef and Pork
To Pork
To Pork
General Packing
$ 18,456.45
100%
$ 18,456.45
Power
17,934.16
90%
16,140.74
Delivery
7,093.58
96%
6,809.84
Sales
3,861.11
98%
3,783.89
Administrative
17,723.53
95%
16,837.35
Labor
113,823.32
94%
106,993.92
$169,022.19
The taxpayer's pork processing "costs of production" as that term is used in section 907 (e)(1)(B) for the *45 tax period amounted to $40,213.54 or $2,9760 per cwt. of the 13,512.77 units processed during that period. These costs were made up of the following items: Amount Allocated
Item
To Pork
General Packing
$ 2,901.28
Power
4,394.02
Delivery
1,670.88
Sales
676.52
Administrative
6,624.07
Labor
23,946.77
$40,213.54
The taxpayer bore the burden of $8,144.15 paid as processing taxes, and has not been relieved thereof nor reimbursed therefor nor shifted such burden, directly or indirectly, through inclusion of such amount by the taxpayer, or by any person directly or indirectly under its control, or having control over the taxpayer, or subject to the same common control, in the price of any article with respect to which a tax was imposed under the provisions of the Agricultural Adjustment Act or in the price of any article processed from any commodity with respect to which a tax was imposed under such Act or in any charge or fee for services or processing; through reduction of the price paid for any such commodity; or in any manner whatsoever; and no understanding or agreement, written or oral, exists whereby the taxpayer may be relieved of the burden of such amount, *46 be reimbursed therefor, or may shift the burden thereof. Opinion BLACK, Judge: The issue in this proceeding has been previously stated. The applicable statute is Title VII (sections 901 to 917, inclusive) of the Revenue Act of 1936 as amended by section 510 of the Revenue Act of 1942, which statute was enacted as the result of the processing tax under the Agricultural Adjustment Act having been declared an unconstitutional levy by the Supreme Court in . Section 902 of the statute, as amended, provides that as a prerequisite to a refund of any amount paid as a tax under the Agricultural Adjustment Act, the claimant must establish that he bore the burden of the tax. Section 907 deals with evidence and presumptions, the pertinent provisions of which as far as the establishment of a prima-facie case is concerned, are in the margin.[4]
*47 The first and most important difference between theparties is what period of time is to be considered as the "tax period" in this proceeding. Congress has defined the term in section 907 (c), set out in footnote 4 below as meaning "the period with respect to which the claimant actually paid the processing tax to a collector of internal revenue and shall end on the date with respect to which the last payment was made." Both parties agree that the tax period began on November 5, 1933, the date when the processing tax on hogs first went into effect. The parties also agree that the taxpayer actually paid all of the processing taxes imposed for November and December 1933, January, February, March and November 1934; that the taxpayer actually paid 96.855 percent of the tax imposed for April 1934, 15.461 percent of the tax imposed for December 1934, 12.54 percent of the tax imposed for January 1935, and 15.371 percent of the tax imposed for February 1935; and that the taxpayer paid no part of the processing taxes imposed for May, June, July, August, September and October of 1934. Petitioners primarily contended that the "tax period" begins on November 5, 1933 and takes in all of the remaining *48 part of 1933, all of January, February, March and November 1934, and the above-mentioned percentages of April and December 1934, and of January and February 1935. The respondent contends that the "tax period" begins on November 5, 1933 and takes in all of the remaining part of 1933, all of the year 1934, all of January 1935 and 15.371 percent of February 1935. Petitioners have in the alternative suggested that the "tax period" be considered as beginning on November 5, 1933 and taking in all of the remaining part of 1933, all of January, Feb ruary, March, April, May and 42.177 percent of June 1934, upon the assumption that the payments as they were received were applied against the earliest outstanding assessments. We agree with petitioners' primary contention as that contention takes in only the period with respect to which the taxpayer actually paid to the collector the processing taxes here in question. We cannot subscribe to the respondent's contention as that contention takes in months and portions of months with respect to which processing taxes were imposed but not actually paid. The objection to petitioner's alternative suggestion is that it is based upon the assumption that *49 the payments actually made by the taxpayer were applied against the earliest outstanding assessments which assumption is contrary to the actual fact. A schedule of processing taxes assessed against Croninger Packing Company, Inc., and payments made by it, prepared by the Bureau of Internal Revenue from its records, was introduced in evidence. Neither party disputes its correctness. Our findings of fact as to the amounts of processing taxes assessed against petitioner from November 1933 to December 1935, and the amounts paid by petitioner during such time, and when paid, are based upon this schedule. True the period suggested as an alternative by petitioner and the period contended for by the respondent would each run consecutively without any breaks but this, we think, is not necessary under the law. The "period before and after the tax" sometimes referred to herein as the "base period" and defined in section 907 (c), supra, does not run consecutively. As far as the tax result is concerned it does not make a great deal of difference as far as the establishment of a prima-facie case is concerned whether the "tax period" be considered as the one primarily contended for by petitioners *50 or the one they suggest as an alternative. By using as the tax period the one primarily contended for, a rebuttable presumption is established that of the processing taxes paid the taxpayer bore the burden to the extent of $5,438.89. If the tax period suggested as an alternative were used, the taxes presumed to have been borne by the taxpayer would amount to $4,957.84. [5] If the tax period contended for by the respondent were used, the average margin during the tax period would be higher than the average margin during the period before and after the tax and under section 907 (a) it would be prima-facie evidence that none of the burden of the taxes paid was borne by the taxpayer but that it was shifted to others.[6] Cf. . But as we stated above the respondent's contention takes in months and portions of months with respect to which no processing taxes were actually paid. This appears to be contrary to that part of Article 605 of Regulations 96 [7] which provides as follows: In determining the average margin for the tax period, the "number of units of the commodity processed" shall be the number of units of the commodity *51 with respect to which the claimant actually paid the processing tax; the "cost of the commodity processed" shall be the cost of the number of units of the commodity with respect to which the claimant actually paid the processing tax; the "gross sales value of articles" shall be the gross sales value of articles processed from the number of units of the commodity with respect to which the claimant actually paid the processing tax. *52 If the taxpayer had refrained from paying any tax imposed after the month of April, 1934, the "tax period" under the statute obviously would have comprised the period from November 5, 1933 to April 30, 1934, inclusive. The fact that the taxpayer missed paying the taxes imposed for the months of May, June, July, August, September and October, 1934, and started paying again in November, does not, in our opinion, justify adding those intervening months for which no tax was paid to the "tax period". Congress in section 907 (b) (1), set out in footnote 4, recognized that there would be "months (or portions of months) within the tax period." As far as we have been able to ascertain there are no decided cases on the question of what constitutes the "tax period" other than the following determination made by the former Processing Tax Board of Review in Ohio Provision Company, Docket No. 51, dated September 27, 1939, wherein the Board said: The record shows that the petitioner paid processing taxes only during the period included between November 5, 1933 (the date when the processing tax on hogs took effect) and February, 1935, inclusive, and April, 1935. In accordance with the definition *53 of the term "tax period" in Section 907 (c) for the Act, it has been determined that for the purposes of this proceeding those months shall constitute the tax period. While there does not appear to have been any contest between the parties in that case concerning the particular question we have here, the determination of the Processing Tax Board of Review in the Ohio Provision Company case, supra, of what constitutes the tax period coincides with our views on the question and is in accord with the primary contention of the petitioners in the instant proceedings. We, therefore, hold that the "tax period" in the instant proceedings begins on November 5, 1933, and takes in all of the remaining part of 1933, all of January, February, March and November, 1934, and the above-mentioned percentages of April and December, 1934, and of January and February, 1935. Aside from what constitutes the tax period the parties are in substantial agreement as to the figures necessary to determine the "average margin for the tax period and the average margin for the period before and after the tax" referred to in section 907 (b), supra, except the cost of commodity for that part of November, *54 1933, included in the tax period. Petitioners contend that the cost is $12,078.31, whereas the respondent contends it is $9,534.81. Both parties rely upon the Kill Book which was introduced in evidence as petitioners' Exhibit 9. We agree with the respondent for the reason that the cost contended for by petitioners includes two purchases made prior to November 5, 1933 in the total amount of $2,443.80, which are included as a part of the cost of commodity for the period before and after the tax and should not, therefore, be included as a part of the cost for the tax period which did not begin until November 5, 1933. The remaining difference of $99.70 is an error in addition in the Kill Book. The correct cost of commodity from November 5 to and including November 30, 1933 is $9,534.81 and we have so found in our findings. We have also found that petitioners in accordance with section 907 (a) of the Revenue Act of 1936 have established a rebuttable presumption that the burden of the processing taxes in question in the amount of $20,871.45 was borne by the taxpayer to the extent of $5,438.89. Either the taxpayer or the respondent may rebut this presumption by proof of the actual extent *55 to which the taxpayer shifted the burden to others. See section 907 (e) of the Revenue Act of 1936, the pertinent provisions of which are in the margin. [8]
*56 The principal argument made by the respondent in his brief for the tax period he is contending for is that if we exclude from the statutory "tax period" the months of May, June, July, August, September and October, and the portions of the months of April and December of 1934 and the portion of January, 1935, with respect to which the taxpayer paid no processing taxes, then the processing done during these excluded months and portions of months must be given consideration under section 907 (e) (2), and that when this is done the same result will be obtained as if we had agreed with the respondent in the first place as to what constituted the tax period. In this we think the respondent has misconstrued the statute. The figures which the respondent would have us consider under section 907 (e) (2) all deal with the processing of pork for a period other than the statutory tax and base periods. In our view we are not concerned with those figures in this proceeding. The taxpayer did do a little processing of beef in addition to the pork and if the respondent had offered evidence of the average margin for the tax period and the average margin for the period before and after the tax with *57 respect to beef, that would have been proper evidence to consider under section 907 (e) (2). But the respondent did not offer any such evidence as to the beef processed and we cannot consider under section 907 (e) (2) the pork that was processed outside of the statutory tax and base periods. To consider the effect of the pork processing that was done outside the statutory tax and base periods would, we think, be irrelevant under section 907 (e) (2). The respondent also contends that these figures dealing with pork processing for a period other than the statutory tax and base periods should in any event be given consideration under section 902 (a), the pertinent provisions of which are in the margin [9] He places emphasis upon the phrase "in any manner whatsoever". We think the same answer applies here as was given for the respondent's contention under section 907 (e) (2). The refund which is claimed in this proceeding is for processing taxes imposed and paid for the tax period and it is the burden of such taxes that must have been borne by the taxpayer as a prerequisite to securing the refund and not some other processing taxes that were imposed and not paid for some period other than *58 the tax period. We, therefore, reject this contention. *59 In our findings of fact we have found from the evidence that the taxpayer's pork processing "costs of production" as that term is used in section 907 (e) (1) (B), set out in footnote 8, for the tax period is $.3284 higher than for the base period. This figure is lower than that contended for by petitioners and higher than that contended for by the respondent, but represents our best judgment as to the true facts, the details of which are in our findings. As to the effect of any difference in costs of production petitioners in their brief argue the principle involved as follows: From the aforesaid analysis it is clear that the increase in manufacturing costs for the "tax period" over similar costs for the base period indicate that the burden of the tax, to the extent of this increased cost, was borne by the petitioner, [taxpayer] and could not be shifted to others. The last sentence of Section 907 (e) (1) of the Revenue Act of 1936 provides: If the Commissioner determines that the difference in average margin was due in part to the tax and in part to the increase in other costs, he shall apportion the change in margin between them * * *. The apportionment method of calculation *60 outlined above and elsewhere in Section 907(e)(1) of the Revenue Act of 1936 appears to apply only in those cases where the average margin during the "tax period" was higher than during the base period in the prima-facie showing. Here again our case appears to be unique, since apparently all the cases considered by the Processing Board of Tax Review providing apportionment of costs of production, pertained to those cases where the average margin during the "tax period" was higher than the base period, and evidence of increased costs, etc. were permitted to rebut the presumption of the prima-facie showing. In other words, based upon the evidentiary facts as we have found them, petitioners would compute the amount to be refunded as follows: 1. Excess average margin per unit for
base period over tax period
$ .4025
2. Add excess cost of production per
unit for tax period over base
period
.3284
3. Total tax per unit borne by tax-
payer
$ .7309
4. Total units of commodity proc-
essed
13,512.77 cwt.
5. To be refunded (Item 3 multiplied
by Item 4)
$9,876.48
The respondent, although contending that petitioner has failed to prove any excess production costs during the tax period *61 over the base period, also contends that the mere fact that the average margin for the tax period is less than the average margin for the period before and after the tax is no reason in itself for not apportioning the change in margin between the tax and the increased costs as provided for in the last sentence of section 907 (e) (1). We agree with that contention. In our opinion, the difference in the average margin was due in part to the tax and in part to the increase in other costs and should be apportioned between the two. See . The amount of tax per unit was $1.5446 ($20,871.45 divided by 13,512.77 units). Under section 907 (a) it was presumed that $.4025 of this was borne by the taxpayer and the balance or $1.1421 was shifted. Under section 907 (e) (1) this presumption is rebutted to the extent that only 1.5446 (tax) of the 1.8730 (tax plus additional costs) $1.1421 or $.9419 was shifted to others. This leaves $.6027 of the tax as having been borne by the taxpayer which multiplied by the 13,512.77 units processed gives $8,144.15 as representing the amount to be refunded unless either the petitioners or the respondent *62 have offered other proof under sections 902 or 907 (e) in addition to the costs of production which would have the effect of either increasing or decreasing the said amount of $8,144.15. Petitioners contend that depreciation of its plant and machinery should also be considered as an item of "costs of production" as that term is used in section 907 (e) (1) (B). The respondent contends in his brief that "depreciation is not generally considered a cost of production since it is not the type of cost which has an immediate effect on the sale prices of articles." In , which was an unjust enrichment tax case, we did not include depreciation as a part of the "costs of production" as the term is used in section 501 (i) (1) (B) of the Revenue Act of 1936, which provision is substantially the same as section 907 (e) (1) (B). Neither party in that case was contending that we should do so. But we need not decide this point in the instant proceeding for the reason that the record does not show the correct depreciation attributable to the tax period and to the base period. Petitioners also contend that the taxpayer bore the entire burden of *63 the tax by reason of the fact that the operations from pork processing during the tax period resulted in a loss. Petitioners have not established that the taxpayer sustained a loss during the "tax period" in its operations from pork processing. Petitioners have proved that for the calendar year 1934 taxpayer suffered a loss from the sale of its pork products and we have so found in our findings of fact. But the evidence is not sufficient to show that petitioner suffered a loss from this branch of its business in the "tax period". But even if a loss from the sale of pork products during the "tax period" had been proved, it would not follow therefrom that the taxpayer bore the burden of the tax. See . Finally, petitioners contend that by reason of economic conditions existing in the locality the tax could not be added to the selling price or otherwise shifted to the taxpayer's customers. This may have been the opinion of the board of directors of the taxpayer but the records of the taxpayer convince us that the taxpayer shifted a part of the burden of the tax to others and only bore a part of *64 the burden itself. Cf. . Neither the petitioners nor the respondent have offered other proof under sections 902 or 907 (e) in addition to the costs of production which would have the effect of either increasing or decreasing the above-mentioned amount of $8,144.15. We hold, therefore, that the taxpayer is entitled to a refund of the processing taxes in question to the extent of $8,144.15. The taxpayer's claim will be allowed to the extent of $8,144.15. Decision will be entered that the amount of refund due the petitioners with respect to the claim for refund of tax paid by Croninger Packing Company, Inc. on the processing of hogs is $8,144.15. Footnotes
1. The term "base period" is sometimes used in this report for brevity to indicate the "period before and after the tax" which is defined in section 907(c) of the Revenue Act of 1936 as meaning "the twenty-four months * * * immediately preceding the effective date of the processing tax, and the six months, February to July, 1936, inclusive." The effective date of the processing tax was November 5, 1933. ↩
2. The term "tax period" is defined in section 907(c) of the Revenue Act of 1936 as meaning "the period with respect to which the claimant actually paid the processing tax to a collector of internal revenue and shall end on the date with respect to which the last payment was made." The parties are not in agreement as to what constitutes the "tax period" in this proceeding.↩
3. Beginning with this paragraph the remainder of the findings are the result of proof offered by either the petitioners or the respondent in accordance with section 907(e) of the Revenue Act of 1936 which provides in part that "Either the claimant or the Commissioner may rebut the presumption established by subsection (a) of this section by proof of the actual extent to which the claimant shifted to others the burden of the processing tax."↩
4. SEC. 907. EVIDENCE AND PRESUMPTIONS. (a) Where the refund claimed is for an amount paid or collected as processing tax, as defined herein, it shall be prima-facie evidence that the burden of such amount was borne by the claimant to the extent (not to exceed the amount of the tax) that the average margin per unit of the commodity processed was lower during the tax period than the average margin was during the period before and after the tax. If the average margin during the tax period was not lower, it shall be prima-facie evidence that none of the burden of such amount was borne by the claimant but that it was shifted to others. (b) The average margin for the tax period and the average margin for the period before and after the tax shall each be determined as follows: (1) Tax Period. - The average margin for the tax period shall be the average of the margins for all months (or portions of months) within the tax period. The margin for each such month shall be computed as follows: From the gross sales value of all articles processed by the claimant from the commodity during such month, deduct the cost of the commodity processed during the month and deduct theprocessing tax paid with respect thereto. The sum so ascertained shall be divided by the total number of units of the commodity processed during such month, and the resulting figure shall be the margin for the month. (2) Period Before And After The Tax. - The average margin for the period before and after the tax shall be the average of the margins for all months (or portions of months) within the period before and after the tax. The margin for each such month shall be computed as follows: From the gross sales value of all articles processed by the claimant from the commodity during such month, deduct the cost of the commodity processed during the month. The sum so ascertained shall be divided by the number of units of the commodity processed during such month, and the resulting figure shall be the margin for the month. (3) Average Margin. - The average margin for each period shall be ascertained in the same manner as monthly margins under subdivisions (1) and (2), using total gross sales value, total cost of commodity processed, total processing tax paid, and total units of commodity processed, during such period. * * * * *
(c) The "tax period" shall mean the period with respect to which the claimant actually paid the processing tax to a collector of internal revenue and shall end on the date with respect to which the last payment was made. The "period before and after the tax" shall mean the twenty-four months (except that in the case of tobacco it shall be the twelve months) immediately preceding the effective date of the processing tax, and the six months, February to July, 1936, inclusive. * * *↩
5. Based upon the "tax period" suggested as an alternative, the total gross sales value would be $121,759.83, the total cost of commodity processed would be $62,995.37, the total units of commodity processed would be 13,512.78 cwt., and the average margin would be $2.8042. ↩
6. Based upon the "tax period" contended for by the respondent, the total gross sales value would be $299,069.98, the total cost of commodity processed would be $162,074.73, the total units of commodity processed would be 27,745.85 cwt., and the average margin would be $4.1853 which is higher than the "average margin for the period before and after the tax" of $3.1711 set out in our findings. ↩
7. Regulations 96 relate to claims for refund under Title VII of the Revenue Act of 1936 of taxes paid under the Agricultural Adjustment Act, as amended.↩
8. (e) Either the claimant or the Commissioner may rebut the presumption established by subsection (a) of this section by proof of the actual extent to which the claimant shifted to others the burden of the processing tax. Such proof may include, but shall not be limited to - (1) Proof that the difference or lack of difference between the average margin for the tax period and the average margin for the period before and after the tax was due to changes in factors other than the tax. Such factors shall include any clearly shown change (A) in the type or grade of article or commodity, or (B) in costs of production. If the claimant asserts that the burden of the tax was borne by him and the burden of any other increased costs was shifted to others, the Commissioner shall determine, from the effective dates of the imposition or termination of the tax and the effective date of other changes in costs as compared with the date of the changes in margin (when margins are computed for weeks, months, or other intervals between July 1, 1931, and August, 1936, in the manner specified in subsection (b)), and from the general experience of the industry, whether the tax or the increase in other costs was shifted to others. If the Commissioner determines that the difference in average margin was due in part to the tax and in part to the increase in other costs, he shall apportion the change in margin between them; (2) * * * If the claimant processed any product in addition to the commodity with respect to the processing of which there was paid or collected an amount as tax for which he claims a refund, and if the Commissioner has reason to believe that the burden of such amount was shifted in whole or in part by means of the transactions relating to such product, the average margin with respect to such product, and articles processed therefrom, shall also be considered, and shall be determined for the tax period applicable to the commodity and for the period before and after the tax in the manner prescribed in subsection (b) of this section. To the extent the Commissioner determines that the average margin with respect to such product was higher during the tax period than it was during the period before and after the tax, it shall be prima-facie evidence that such amount was not borne by the claimant but that it was shifted to others.↩
9. SEC. 902. CONDITIONS ON ALLOWANCE OF REFUNDS. No refund shall be made or allowed in pursuance of court decisions or otherwise, of any amount paid by or collected from any claimant as tax under the Agricultural Adjustment Act, unless the claimant establishes to the satisfaction of the Commissioner in accordance with regulations prescribed by him, with the approval of the Secretary, or to the satisfaction of the trial court, or the Board of Review in cases provided for under section 906, as the case may be - (a) That he bore the burden of such amount and has not been relieved thereof nor reimbursed therefor nor shifted such burden, directly or indirectly, (1) through inclusion of such amount by the claimant, or by any person directly or indirectly under his control, or having control over him, or subject to the same common control, in the price of any article with respect to which a tax was imposed under the provisions of such Act, or in the price of any article processed from any commodity with respect to which a tax was imposed under such Act, or in any charge or fee for services or processing; (2) through reduction of the price paid for any such commodity; or (3) in any manner whatsoever, and that no understanding or agreement, written or oral, exists whereby he may be relieved of the burden of such amount, be reimbursed therefor, or may shift the burden thereof; * * *↩